# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-0172V**

| | |
|---|---|
| CLAIRE PAUL,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: August 31, 2026 |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Jay Travis Williamson, U.S. Department of Justice, Washington, DC, for Respondent.*

**DECISION AWARDING DAMAGES**[1]

On February 7, 2023, Claire Paul filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following a tetanus vaccine she received on September 13, 2021. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree on the amount of compensation.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the total amount of **$120,340.11,** comprised of $120,000.00 for actual pain and suffering, plus $340.11 for past unreimbursed medical expenses**.**

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Relevant Procedural History

After Respondent conceded that Petitioner was entitled to compensation, the parties attempted to resolve damages before reaching an impasse in December 2024. *See* ECF No. 45. Petitioner filed a Motion for a Ruling on the Record regarding damages ("Mot.") on March 3, 2025. ECF No. 51. Respondent filed a response ("Resp.") on April 15, 2025, and Petitioner filed a reply ("Repl.") on May 18, 2025. ECF No. 54-55. I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 57. That hearing was held on August 21, 2026,[3] and the case is now ripe for a written determination.

## II. Relevant Medical History

Petitioner was 44 years-old when she received a tetanus-containing vaccine in her left arm from her primary care provider ("PCP") on September 13, 2021. Ex. 1 at 1. She called the office two days later to report pain and loss of range of motion in her left arm since her vaccination. Ex. 3 at 66. After being unable to schedule an appointment with her PCP, she was seen at urgent care the same day. Ex. 2 at 3. While at urgent care, Petitioner reported 8/10 pain in her left shoulder that began immediately after her vaccination. *Id*. She reported that she could not lift her arm and "that some of the feeling was gone." *Id*. On exam, she had reduced range of motion and strength and was moderately tender to palpation. *Id*. at 4. She was diagnosed with bursitis, given Toradol and methylprednisolone injections, prescribed prednisone and cyclobenzaprine, and referred to physical therapy. *Id*. at 5-6.

Petitioner returned to her PCP a week later, on September 21, 2021. Ex. 3 at 6. She reported left shoulder pain immediately after her September vaccination, which had improved somewhat since her urgent care visit. *Id*. On exam, her range of motion was reduced in flexion. *Id*. at 6. Her PCP agreed with the prior bursitis diagnosis and prescribed Voltaren gel and anti-inflammatories. *Id*.

Petitioner began her first course of physical therapy on October 5, 2021. Ex. 4 at 24. At her initial evaluation, she reported "excruciating" shoulder pain "after a tetanus shot that did not go away." *Id*. at 26. Her pain was 2/10 that day (and up to 6/10 at worst) and she reported difficulty with dressing, sleeping, and lifting objects overhead. *Id*. at 24. She attended four sessions through October 14, 2021. *Id*. at 12-20. Petitioner noted during her last session that she was relocating in the near future. *Id*. at 13.

---

[3] At the end of the hearing held on August 21, 2026, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

On November 15, 2021, Petitioner was involved in a car accident. She received treatment continuing into 2023, including physical therapy, chiropractic care, and injections, for injuries to her neck, back, and jaw (TMJ). *See* Ex. 4 at 7; 61-65 (15 sessions of physical therapy); Ex. 5 at 2-8; Ex. 6; Ex. 7 at 3 (including radiating pain down to the shoulders/arms); Ex. 14 at 12-54.

Petitioner returned to physical therapy for her shoulder pain on February 15, 2022 (four months later). Ex. 4 at 45. Petitioner reported that she had received treatment after her car accident, which caused her to "discontinue PT for her shoulder." *Id*. She reported continued pain (5/10) that made "yoga, cleaning, and lifting activities" difficult. *Id*. On exam, her range of motion was decreased (to 90 degrees of flexion and abduction). *Id.* She completed ten sessions through April 15, 2022. *Id*. at 81. The record of her last visit notes "100% improvement with L shoulder. Pt reports [home exercise program] resolved occasional 'crunching' and 'stiffness.'" *Id*. Her therapy goals were met and she was given an updated home exercise program. *Id*. at 83-84.

Eighteen months later (and after this claim's initiation), on October 19, 2023,[4] Petitioner returned to treatment with an orthopedist. Ex. 14 at 73. She reported left shoulder pain that began after a vaccination about two years ago, with pain "becoming slightly worse now without new injury." *Id*. at 73, 75. She rated her pain at 6/10. *Id*. On exam, she had "near full" active range of motion that was mildly limited in flexion, and full passive range of motion with pain at the end ranges. *Id*. The doctor ordered an MRI,[5] administered a steroid injection, and referred Petitioner back to physical therapy. *Id*. at 76.

Petitioner returned to the orthopedist on November 9, 2023, reporting about 15% relief from the injection. Ex. 14 at 103. Her pain was 4/10 at rest, but increased to 7-8/10 "when aggravated." *Id*. She was given therabands for use for a daily home exercise program, was referred back to formal physical therapy, and was given prescription diclofenac. *Id* at 105.

Petitioner began a second course of physical therapy on November 28, 2023. Ex. 15 at 5. She reported a "vaccine injury two years ago," and pain while sleeping on her shoulder, with the pain preventing her from doing yoga. *Id*. She described the pain as

[4] Throughout the gap in treatment for her shoulder pain (between September 2022 and August 2023), Petitioner continued to receive orthopedic treatment and PT for her neck and back (Ex. 14 at 31-54; Ex. 18 at 21-67), orthopedic care and PT for an ankle injury (Ex. 14 at 81-87; and PT for jaw pain (Ex. 4 at 61-65).

[5] The MRI, on November 7, 2023, revealed minimal tendinosis, minimal AC joint degeneration, and findings suggestive of a prior sprain or adhesive capsulitis. Ex. 21 at 4.

"annoying, sore, and a dull ache" that was "beginning to limit her ROM." *Id*. She completed eight sessions through January 11, 2024[6] and was discharged with an HEP. *Id*. at 24. The discharge summary states that Petitioner was "instructed to hold on therapy due to litigation from prior MVA." *Id*.

Petitioner returned to the orthopedist five months later, on May 7, 2024. Ex. 16 at 17. She rated her pain as 8/10 at its worst. *Id*. She was given another steroid injection and another home exercise program. *Id*. at 18. She returned on June 4, 2024 for a follow up, but wanted to consider the recommended arthroscopic surgery longer, rather than schedule at that time. Ex. 19 at 5. She returned two weeks later with complaints that her pain "frequently wakes her from sleep" and agreed to schedule surgery. *Id*. at 9-10. At her pre-op visit, on July 5, 2024, she reported 6/10 pain. Ex. 19 at 21.

Petitioner had arthroscopic surgery on July 30, 2024. Ex. 17 at 8. The procedures included a rotator cuff repair, extensive debridement of the GH joint, and subacromial decompression and bursectomy. *Id*.

Petitioner attended 38 post-operative physical therapy sessions between August 8, 2024, and January 20, 2025. Ex. 18 at 106-126; Ex. 30 at 116.[7] She continued to follow-up with her orthopedist through January 2025. Ex. 23 at 39. By November 11, 2024, she reported 70% improvement in pain, rating it only 2/10. *Id.* at 33. She was advised that it could take a full year for recovery from surgery. *Id*. at 34. By January 3, 2025 (the last record), she reported minimal pain besides general tightness and some soreness. *Id.* at 40.

<u>Affidavit Testimony</u>

Petitioner provided a damages affidavit in support of her claim. *See* Ex. 22. She stated that her shoulder pain began mediately after her vaccination, and that she "immediately knew something was wrong." Ex. 22 at ¶4. She said she informed both the doctor and the nurse who administered the vaccine – and the doctor was dismissive, stating that tetanus vaccines generally are painful. *Id*. at ¶5. She described the initial pain as "excruciating," rated it at 9/10 that evening and stated that she stayed home from work the following day. *Id*. at ¶6. She called her PCP the next day and was advised there were no appointments until the following month. *Id*. She persisted and scheduled an appointment eight days later, but still went to urgent care. *Id*. at ¶10.

---

[6] At a follow-up appointment with her orthopedist on December 7, 2023, Petitioner reported "significant improvement in pain and range of motion." Ex. 14 at 68. She stated that she was "now participating in regular swimming and yoga." *Id*. She was to follow up as needed. *Id*. at 69.

[7] Petitioner filed records for an additional 31 physical therapy sessions the day after she filed her reply brief regarding damages. *See* Ex. 30; ECF No. 55.

Petitioner explained that she moved in October 2021 – the month after her vaccination - and was unable to pack, clean, or move, requiring her to hire additional help. Ex. 22 at ¶12. She also stated that in November 2021 – two months after her vaccination – she was in a car accident and injured her neck and back (but not her left shoulder). *Id*. at ¶14. Her left shoulder pain persisted thereafter, but she focused on treating her neck and back pain at that time. *Id*. Petitioner also stated that she had a hysterectomy in January 2023, and an ankle injury in April 2023. *Id*. at ¶14. She reported her shoulder pain persisted throughout this period, but that she managed it with medication and her home exercises before returning to treatment. *Id*. at ¶15.

Petitioner stated that because of her injury, she was treated for insomnia and major depression – and her quality of life drastically changed. *Id*. at ¶22-23. She explained that she misses yoga and that her ability to create art had been "severely limited." *Id*. at ¶23. Petitioner says that her doctor suggested that she may need a second procedure – a manipulation under anesthesia – in the future. *Id*. at ¶21.

Petitioner's husband also filed an affidavit. Ex. 24. He recalled Petitioner complaining of pain on the day of her vaccination. *Id*. at ¶2. He noted that she was now unable to exercise regularly, including yoga, and has difficulty with basic daily activities. *Id*. He stated that Petitioner's injury "disrupted [their] entire routine," and he had to help with tasks like cooking, cleaning, and driving. *Id*. at ¶4. He also noted that he had seen Petitioner struggle emotionally and that her injury caused her to feel less independent. *Id*. at ¶5.

## III. The Parties' Arguments

Petitioner seeks $165,000.00 for pain and suffering. Mot. at 1. In her brief and argument, Petitioner highlighted the long duration of her injury over more than three years, her reports of high levels of pain, and her substantial treatment with medications, cortisone injections, physical therapy, and arthroscopic surgery. *Id.* at 10-11. Petitioner discussed prior SIRVA cases that involved injured claimants with awards ranging from $140,000.00 to $170,000.00, making her request reasonable. *Id*. at 11-15.

Regarding out-of-pocket expenses, Petitioner requests as award of $5,221.36, comprised of co-payments for medical visits and physical therapy, moving and repair expenses, cleaning expenses, and reimbursement for a yoga membership. Mot. at 15-16; Ex. 25-29.

Respondent proposes a pain and suffering award of $85,000.00. Resp. at 2. He highlights the first six months of conservative treatment that resulted in good resolution of symptoms, followed by large gaps of 18 months and five months before additional, and

more substantial, treatment. *Id*. at 11-13. Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that all had circumstances that did not mirror Petitioner's circumstances. *Id*. at 16-18. Respondent also cited three prior SIRVA cases with awards between $95,000.00 and $105,000 to justify his proposed award. *Id*. at 13-16.

Respondent disputed most of Petitioner's claimed out-of-pocket expenses. Resp. at 18-19. He argued that Petitioner's expenses for movers, painting and repairs, and yoga "are not contemplated by the Act." *Id*. at 18. Further, Respondent disputed Petitioner's proof for certain expenses, including urgent care and physical therapy co-payments and prescription medications. *Id*. at 18-19. Respondent did not address certain expenses.

## IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and

suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

## V. Prior SIRVA Compensation Within SPU[8]

### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[9] In only 270 of these cases, however, was the amount

[8] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[9] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do

of damages determined by a special master in a reasoned decision.[10] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[11]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

| | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[12] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[10] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[11] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[12] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[13] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[14]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

---

[13] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs*., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[14] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs*., 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

## VI. Appropriate Compensation in this Case

### a. Pain and Suffering

When determining the appropriate amount of compensation for a petitioner's pain and suffering, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in SIRVA cases and rely upon my experience adjudicating these cases. I ultimately base my determination on the specific circumstances of this case and what I learn about the individual petitioner.

In this case, there is no dispute that Petitioner was aware of her injury. Petitioner sought treatment almost immediately – only two days after her vaccination – for significant shoulder pain. Ex. 2 at 3. She received injections of methylprednisone and Toradol and prescription medications during that initial visit. *Id*. at 4-5. She treated her injury through the first six months with physical therapy with good results. *See* Ex. 4 at 9-24; 81 ("100% improvement with L shoulder. Pt reports [home exercise program] resolved occasional 'crunching' and 'stiffness.'").

Petitioner then did not treat her shoulder pain for the next 18 months, during which she addressed other medical issues, including injuries from a car accident, an unrelated surgery, and an ankle injury. *See e.g.*, Ex. 4 at 61-65 (PT for jaw pain); Ex. 14 at 31-54; Ex. 18 at 21-67 (orthopedic care and PT for an ankle injury; Ex. 14 at 81-87. Once she returned to treatment, she received cortisone injections, physical therapy, and ultimately arthroscopic surgery. The filed records show treatment spanning almost 3.5 years with gaps, one of which was substantial. Petitioner reports ongoing problems with range of motion and pain. Ex. 22 at ¶20.

Respondent argues that the gaps in Petitioner's treatment course - four months, 18 months, and five months respectively, equaling nearly twice as long as her periods of active treatment – justify a "significant reduction in the total pain and suffering damages to be awarded." Resp. at 9-11. He further highlights that Petitioner continued to receive treatment for other medical conditions, including orthopedic issues, during the gaps in shoulder treatment. *Id*. at 10.

To support his argument, Respondent relies on *Shelton v. Secretary of Health and Human Services,* No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021), *Hunt v. Secretary of Health and Human Services*, No. 19-1003V, 2022 WL 2826662f (Fed. Cl. Spec. Mstr. June 16, 2022), and *Crawford v. Secretary of Health and Human Services,* No. 19-0544V, 2024 WL 1045147 (Fed. Cl. Spec. Mstr. Feb. 5, 2024). *Id.* at 13-16. But *Shelton* and *Crawford* involved claimants who substantially delayed seeking initial

treatment, which was a significant factor in my pain and suffering determination. Here Ms. Paul sought treatment only two days after her vaccination – highlighting the initial severity of her symptoms. And although the *Hunt* claimant sought treatment within weeks of her vaccination, her treatment course was far shorter than in the instant case. Thus, Respondent's proposed award is too low.

At the same time, the cases cited by Petitioner are also distinguishable, and do not sufficiently account for the large gaps in treatment, nor the intervening car accident two months post-vaccination. *Bryant v. Secretary of Health and Human Services,* No. 21-2241V, 2024 WL 1739776 (Fed. Cl. Spec. Mstr. Mar. 20, 2024), cited by Petitioner, is a helpful benchmark, but still too high. That claimant sought treatment within 12 days of vaccination for severe shoulder pain and treated over the following three years (including a surgery) with a long gap spanning 18 months (while she was away from home at college). *Bryant*, 2024 WL 1739776 at *7. She was awarded $140,000.00 in pain and suffering. *Id.* But – Ms. Paul suffered injuries in a car accident two months after her vaccination, which undoubtedly contributed to her concurrent pain and suffering. That accident makes it difficult to attribute all of her post-vaccination pain and suffering to her SIRVA injury.

The lengthy, more than one-year treatment gap (which exceeds the date of filing of this claim) only compounds the reasonable issues raised in response to Petitioner's pain and suffering demand. It is my experience that in treating SIRVAs, comorbid and degenerative shoulder issues are often revealed that could not themselves have been caused by the SIRVA (although they may well have been exacerbated by it). The longer the period of time from onset to more invasive treatment, like surgery, the harder it is to conclude that the surgery mostly, or even partially, relates to the SIRVA (which should be an acute injury). These factors cannot be ignored in this case, and counsel for a lower pain and suffering award than demanded.

Overall, considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$120,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

b. <u>Unreimbursed Expenses</u>

Vaccine Program petitioners may be awarded reasonably necessary actual unreimbursable expenses that were incurred by or on behalf of the person who suffered a vaccine injury. Section 15(a)(1)(B). Petitioner argues that she has paid $5,221.36 for reasonably necessary medical expenses. Mot. at 15-16. Petitioner's requested award includes $340.11 for medical appointment co-payments and prescription costs, $886.25 for movers, $3,100.00 for painting and repairs, $535.00 for cleaning services, and $360.00 for a yoga membership. *See* Ex. 25. Petitioner argues that she was unable to

use her yoga membership due to her shoulder injury and was unable to perform painting, repairs, cleaning, and moving necessary for her move in October 2021. *Id*. at 15.

Respondent proposes an award of $100.00 for Petitioner's past unreimbursed expenses, comprised of four physical therapy co-payments of $25.00 each. Resp. at 19. He disputes Petitioner's proof for (1) prescriptions purchased on September 15 and 22, 2021, (2) a $35.00 co-payment for an urgent care visit on September 15, 2021, and (3) one physical therapy co-payment on February 22, 2022. *Id*. at 18-19. Finally, Respondent argues that expenses for movers, cleaning, repairs/painting, and a yoga membership do "not fall under the terms of the Act and should be denied." *Id*. at 18. Respondent does not address all of Petitioner's claimed expenses.

Respondent disputes Petitioner's proof for a copayment of $35.00 for an urgent care visit on September 15, 2021. Resp. at 19. Petitioner requested reimbursement for two urgent care visits – the September 15, 2021 visit - and one on March 10, 2022, which Respondent has not disputed. Ex. 25 at 1. Petitioner's medical records corroborate visits to Peachtree Immediate Care on both dates. Ex. 2 at 3, 20. Petitioner has provided a receipt for $35.00 dated September 15, 2021. Ex. 29. Petitioner has provided preponderant evidence of the urgent care expense on September 15, 2021 and Respondent has not disputed the March 10, 2022 expense. Thus, Petitioner will be awarded both – for a total of $70.00.

Respondent next contests Petitioner's proof for prescription expenses on September 15, 2021, and September 22, 2021, because the receipt provided does not identify the drugs purchased. Resp. at 18-19. Petitioner's medical records indicate that she was prescribed medications at an urgent care visit on September 15, 2021, and at a PCP visit on September 21, 2021. *See* Ex. 2 at 3; Ex. 3 at 6. Therefore, it is more likely than not that the receipts provided reflect the medications prescribed during those appointments. Petitioner will be awarded the requested $60.11.

Respondent also contests Petitioner's proof for one physical therapy copayment on February 22, 2022, because her "medical records did not include a visit to Results Physiotherapy on February 22, 2022. Resp. at 19. Respondent approves copayments made on February 17, 2022, February 24, 2022, March 1, 2022, and March 3, 2022. *Id*.; *See also* Ex. 27. Respondent does not address two additional copayments requested by Petitioner for visits on March 25, 2022 and April 1, 2022. *See* Ex. 25. Petitioner's medical records for this course of physical therapy reveal that she attended ten sessions: February 15, 2022, February 17, 2022, February 24, 2022, March 1, 2022, March 3, 2022, March 8, 2022, March 25, 2022, April 1, 2022, April 8, 2022, and April 15, 2022. Ex. 4 at 28, 31, 34, 37, 40, 45, 81, 91, 100, 109. Petitioner has requested reimbursement for seven visits. Ex. 25. While it is not clear why Petitioner has not requested reimbursement for her first course of physical therapy with the same provider, she has provided preponderant

evidence that it cost her $25.00 per visit for that course of treatment. *See* Ex. 27. Thus, she will be awarded $25.00 per visit for the seven requested visits, for a total of $175.00.

Respondent has not contested a $35.00 co-payment for a PCP visit on September 21, 2021. *See* Ex. 25. Petitioner's records reflect a visit on that date. *See* Ex. 3 at 6. That amount will be awarded.

Petitioner has not, however, sufficiently substantiated the other expenses requested for movers, cleaning expenses, painting and repairs, and a yoga membership. First, Petitioner purchased the yoga membership in July 2021, two months prior to her vaccination. Ex. 28. The receipt provided does not reflect the length or terms of the membership and there is no evidence in the record regarding whether Petitioner was able to use any of the membership benefits prior to her injury. *See id*. While the inability of Petitioner to participate in an activity like yoga due to her SIRVA was reasonably factored into the pain and suffering award, I do not find the cost of this membership is a reasonable injury-related expense that warrants reimbursement.

Second, some of the cleaning expenses were incurred after Petitioner was involved in a car accident on November 15, 2021, suggesting that those expenses could be attributed to the injuries sustained therein. *See* Ex. 28 at 4. And large-scale cleaning costs are not typically awarded in SIRVA cases, absent preponderant proof that they were reasonably associated with Petitioner's injury. Finally, Petitioner's medical records do not provide sufficient corroboration to establish that the expenses incurred for painting, repairs, movers, and cleaning related to the move were reasonably necessary as a result of her SIRVA. To establish this kind of out-of-the-ordinary expense, more substantiation is required. Therefore, the $4,881.25 for those expenses ($886.25 for movers, $3,100.00 for painting and repairs, $535.00 for cleaning, and $360.00 for yoga expenses) are denied.

Accordingly, I award Petitioner **$340.11** as compensation for her past out-of-pocket expenses (calculated as $70.00 for two urgent care co-payments, plus $60.11 for prescription expenses, plus $175.00 for seven physical therapy co-payments, plus $35.00 for one PCP co-payment).

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $120,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[15] **I also find that Petitioner is entitled to $340.11 for actual unreimbursable expenses.**

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $120,340.11 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[16]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.